# W. R. Ringrose to use *v.* Bloomsburg, Appellant.

*Negligence—Contributory negligence—Borough—Defective sidewalk.*

In an action against a borough to recover damages for personal injuries caused by a fall on a defective sidewalk, the question of defendant's negligence and plaintiff's contributory negligence is for the jury, where the evidence shows that the board walk at the point where plaintiff fell was rotten and upheaved by roots of trees; that some of the cross boards were broken, and some of them out, and that plaintiff in traveling over it at night caught his foot in a hole where a board was out; that although he had previously walked along the side of the street where he fell, he had not done so recently and he was not very familiar with the pavement; that he did not know of its bad condition; that he knew the other side of the street was safe, but "supposed it was all right" to walk on the pavement where he fell.

Argued April 16, 1895. Appeal, No. 215, Jan. T., 1895, by defendant, from judgment of C. P. Columbia Co., on verdict for plaintiff. Before STERRETT, C. J., GREEN, WILLIAMS, MC-COLLUM and MITCHELL, JJ. Affirmed.

Trespass for personal injuries. Before IKELER, P. J.

At the trial it appeared that on the evening of April 12, 1892, at about eight o'clock, plaintiff, a man fifty-two years of age, tripped and fell on a board sidewalk on the south side of Third street in the borough of Bloomsburg. Plaintiff alleged that he was tripped by a loose board or plank in the sidewalk, and after stumbling forward a few steps, caught his foot in a hole and fell, and severely injured his back.

The court charged in part as follows:

" It is proved by a large number of witnesses on behalf of the plaintiff that the pavement was in bad condition—dilapidated, decayed; that the plank and the cross boards were rotten in places and worn and decayed, and raised up or upheaved around the trees from the growth of the roots—of the shade trees, as we take it, planted upon the edge of the pavement. Necessarily, a pavement proved to be in that condition must have been built, laid, several years before. You, as men of skill and experience, must from the general testimony as to the character of this pavement, judge of its age. The testimony is

that it was a wooden pavement when it was made, constructed with three stringers lengthwise upon the street or pavement, with four-foot pieces going over, two-by-fours, laid crosswise and spiked, with the stringers sunk in the earth even with its top at the time of laying the pavement—you must judge, we say, how long that pavement must have lain there before it would become in the rotten, decayed, bad condition which the witnesses testify that it was in on the 12th day of April, 1892.

" W. W. Meyers testified that its condition was plainly observable by daylight—could tell by feeling in the feet in the night-time that it was rough and uneven. Theodore Smith spoke upon that subject. He testified that all passers-by, persons going over the walk in the daytime, could see its bad condition. Thomas Moyer testifies as follows: ' *Question :* You may state whether or not it was plainly observable to all passers-by, whether or not it was plain to be seen. *Answer :* Yes, sir. P. S. Moyer testified in answer to the same question : Well, I don't know but what it would be if you looked from the other side of the road. *Question :* How about persons passing over it, as to its being observable? *Answer :* Could not help but see it. *Question :* At what time of day or night? *Answer :* Could not see much at night, I would not think.' George B. Kitchen said : ' You could see it when you got up pretty well to the schoolhouse, then you could see it.' You will recollect that George B. Kitchen lived at the foot of the hill, as we understand it, down by Railroad street. He was janitor of the public schoolhouse on Third street; and, in speaking of how this pavement might be seen by passers-by, he said you could observe this pavement upon the Robinson lot ' when you got up pretty well to the schoolhouse, then you could see it.' B. F. Taylor said : ' A person standing at the corner of my house, on the opposite side of the alley ' (he lived at that time in the old McReynolds house on the north side of the alley, the house that has since been removed) 'could see that pavement if he stood there and made a business to look down that street, down over them board walks; he could have seen that it was in bad condition in the daylight.' Dr. McReynolds testifies as follows: ' *Question :* From what point could you see that it was in bad condition? *Answer :* In passing down the other side of the street, going up or down.'

" We have now called your attention to the testimony of the plaintiff's witnesses (as nearly as we remember it) who testify upon that point—that it was in bad condition, and that its condition was easily observable to all persons passing by.   The condition spoken of, as described by the witnesses particularly, (and nearly all of them agree on that point,) is that it was decayed, rotten; some of the cross boards broken, some of them out, and that there were depressions or holes where they were out, the depth of which holes was described by some of the witnesses as being of the thickness of the next plank or cross board and what additional depth had been worn in the ground by the passers-by.   It was in one of these holes that, as the plaintiff testifies, he caught his foot.   He testifies that, first, in walking along that pavement, he caught his left foot on a plank or something sticking up—a piece of plank or board or two-by-four or something, he would not undertake to say what, he could not say what; but something loose in the pavement tripped him and pitched him forward, and his feet caught, or one foot, his left foot then went into a hole; and, as he was pitched forward with his right foot he fell in or was caught in another hole—with his right foot or his left foot; at any rate he fell, and it threw him forwards and a little sidewise, and he fell backwards or a little toward his left side and caught his left foot fast in this hole.

" Under the plain and well-established rules of law (as we understand them) applicable to this case, there are four well-defined rules, the facts under any one of which being found against the plaintiff, will prevent his recovery.

" The first rule is that the negligence of the defendant must be the proximate cause of the accident, else the plaintiff cannot recover.

" The second rule is that if the plaintiff knew of the bad condition of the pavement at that locality where he was injured, and yet entered upon the pavement that night in the darkness, such as the witnesses describe it, then he took the risk, and he cannot recover.

" The third rule is that if the plaintiff knew of another and safe way direct and convenient for him, and did not know that the way he took was safe, then, in taking the unknown way, he would be guilty of contributory negligence and cannot recover.

" The fourth rule is that, although he may be injured, yet, if his injuries are not the result of this fall—if the accident here alleged as the cause of his present disabilities (whatever they may be) is not the cause of them, then he cannot recover.

" We will take up these four propositions in their order.  A proximate cause is one which in actual sequence, undisturbed by any other cause, produces the result complained of.  If the tripping over a loose object upon the sidewalk was the proximate cause of the injury to the plaintiff, and if that object was something else and not a part of the pavement and was there at the time without fault on the part of the town of Bloomsburg, and if the plaintiff's fall into the place (hole) where he was hurt, as it is alleged, resulted from tripping over that loose substance (whatever it was) upon the pavement or walk ; then it is not shown that the bad condition of the pavement itself was the proximate cause of the accident to the plaintiff, and therefore he cannot recover—that is, if you find the fact to be as we have just stated it.

" Involved in the second proposition is the important question : Did Ringrose know of the bad condition of this pavement.  What is the testimony upon that subject ?  For you must be guided and governed solely by the testimony in coming to your verdict.  In ascertaining whether he knew or did not know the bad condition of this walk, you may consider the proximity of his place of residence to the place where he was injured, his habit of moving about, and whether this pavement had been and was so notoriously in a dilapidated state that the fact was patent or plainly observable to all passers-by ; because if it was so notoriously in bad condition, then if he had opportunity to know its condition, he was bound to know it.  As we have said, this pavement must have been laid at least several years before the accident.  There is no evidence that at this particular point it was ever repaired from the time it was laid up to the time of the accident.  Indeed, it is admitted by the defense that its condition was so bad and so well known to be bad that the town authorities had constructive notice of its condition ; and the plaintiff has not only proved the fact of its notoriously bad condition, such as to constitute constructive notice, but he has also proved actual and express notice to the town council of the town of Bloomsburg, and a resolution to repair.  But it

is likewise shown that the plaintiff lived for seventeen or eight-
een years (except two years and a half or a year and a half
that he resided in Milton) within a hundred feet of this point
in the pavement.

"As nearly as we can ascertain or recollect the testimony of
the plaintiff upon the subject of his knowledge of the condition
of this pavement, he says : ' On this, the north side of the
street, I did walk, but not very often.' He says he did walk
on the north side of the street. You will recollect that the
pavement complained of is on the south side. He says: ' I did
walk on the north side, but not very often. Was familiar
with it that way, the east end; had been that way to the Meth-
odist church ; the other way I was not familiar with it; don't
think I worked twenty days in my life below Railroad street.
If I have I don't remember it. Very seldom I went down
there ; for the last year or two, probably three, I never went
down only during fair time. In October, 1891, I went down
there then from the back end of my lot, then through the alley ;
sometimes before daylight, once in a while it was light; did not
go that side ' (speaking of the north side) ' because it was better,
but because it was nearer by the way of the alley ; once in a
great while, but very seldom, went around by the pavement;
did not go that side because it was better, knew nothing at all
about it; never went over it by daylight ' (speaking of the
south side) ; ' never went down that street except by the way
of my barn ; I mind walking down once with Al. Herbine, on
the Cohen side ; never examined the pavement, had no occa-
sion for it; in going to the Methodist church, I come out from
my house to the corner of Third street and come to the cross-
ing, to the corner of the Cohen property, and turn to the left
and out Third street; I do not go across Third street there ; I
did walk on the north side of Third street on other days than
Sundays, once in awhile during all the time I lived there up to
the time of the accident; knew the condition of the pavement
on that side towards Judge Elwell's; if there were any bad
places, could tell you about where they were. *Question :* You
knew, as you traveled the route that you took that night, that
the Cohen side of the street was reasonably safe, did you not ?
*Answer :* As far as I knew at the time. *Question :* Why did
you go out of what you knew to be a safe street and venture

on the other side ?    *Answer :* I came up that side of the
street, supposed it was all right.   I have come up on the other
side of the street; did not know anything about the Third
street pavement from the West street 'corner down to the rail-
road; very seldom that I traveled that way ; do not think that
I came that way once in a year—that is, to the best of my
knowledge.   *Question :* When you went down that day on the
north side of Third street, you had no trouble, experienced no
inconvenience, in getting down on that side, did you ?   *An-
swer :* No, sir.    *Question :* Whether or not you did not know
that the pavements from your house to Main street were per-
fectly safe, reasonably safe ?  *Answer :* Yes, sir; pretty good.
*Question :* Main street, at the time of the accident, was in a safe
condition, so far as you knew, Mr. Ringrose ?  *Answer :* I was
not down it, I could not say ;. so far as I know, I do not know
but what it was.    *Question :* You attend the Methodist church ?
*Answer :* I do, sir, every Sunday in my life if I am well.
*Question :* In going to the Methodist church, you come out
from your house to the corner of West and Third streets ?
*Answer :* I do.    *Question :* You went there in the morning ?
*Answer :* Yes, sir.    *Question :* To Sunday school ?   *Answer :*
Yes, sir; backward and forward, to and from church; always
went on the north side.'

  " You must determine and settle these questions under the
rules of law that we have stated—whether Ringrose had notice
of this defective pavement; whether under all the circum-
stances and surroundings, considering his habits of life and that
he testifies that he helped build a barn on the rear end of the
same lot where this pavement existed, and that he traveled back
and forth four times a day for a period of six or eight days within
a few feet of the western end of this pavement, and the fact of
his going to the Methodist church and Sunday school, and to
his work around town—going and coming as all good citizens
do—whether he was bound to know ; applying the same rule
to him as to others, passers-by.   We Was the condition of this
pavement patent, plainly observable ?   Did he pass by it, or
near to it, in such proximity to it that he was bound to observe
its condition ?   If you find that he was so bound, then, we say
to you as matter of law, he is not entitled to recover.   For he
admits (and it is not disputed) that he went down that side,

the north side, of this pavement, that night, on his way to Mrs. Powell's house; that it was a dark night; that he reached her house without any difficulty; that, on his return, he undertook at Railroad street to travel a different route, and that he stumbled in the darkness in getting on and off Railroad street, and across there to the depot, and that when he came to Third street he took this south side of Third street, either as known or that he should have known—immediately left his known safe way (if he knew the other to be safe). If he did so he took the risk of traveling upon a bad pavement, and he cannot recover."

Defendant's point was among others as follows:

"8. That under all the evidence in the case the verdict must be for the defendant. *Answer:* This point is refused. Under all the circumstances we have decided to submit the questions of fact involved in this issue to you for your determination, and under the rules of law you must decide this important case." [1]

Verdict and judgment for plaintiff for $5,000. Defendant appealed.

*Error assigned* was above instruction, quoting it.

*Fred Ikeler, Grant Herring* and *W. H. Rhawn* with him, for appellant, cited: D. L. & W. R. R. v. Cadow, 120 Pa. 559; Haven v. Pittsburg & Allegheny Bridge Co., 151 Pa. 620; 4 Am. & Eng. Ency. of Law, 94; 16 Am. & Eng. Ency. of Law, 466; 2 Cooley on Torts, 804.

*James Scarlet* and *Robert R. Little,* for appellee, cited: Readdy v. Shamokin Borough, 137 Pa. 92; Penna. R. R. v. Sly, 65 Pa. 205; Hall v. Philips, 164 Pa. 494; West Mahanoy Twp. v. Watson, 116 Pa. 344; Baker v. Westmoreland Gas Co., 17 Pa. 593; Ely v. P. C. C. R. R., 158 Pa. 233; Lohr v. Philipsburg, 156 Pa. 246; Burns v. Bradford City, 137 Pa. 361; Beach on Contributory Neg. p. 25, 533; Beatty v. Gilmore, 16 Pa. 463; Merriman v. Philipsburg Borough, 158 Pa. 78; Easton Borough v. Neff, 102 Pa. 474; McKee v. Bidwell, 74 Pa. 218; Hays v. Gallagher, 72 Pa. 136; Kreider v. Turnpike Co., 162 Pa. 537; Erie City v. Schwingle, 22 Pa. 384; Biggs v. West Newton

Borough, 164 Pa. 341; Cooley on Torts, 669; W. C. & P. R. R. v. McElwee, 67 Pa. 315; Lynch v. Erie, 151 Pa. 380; Altoona v. Lotz, 114 Pa. 238; Hill v. Twp. of Tionesta, 146 Pa 11; Forks Twp. v. King, 84 Pa. 230; Mechesney v. Unity Twp., 164 Pa. 358.

PER CURIAM, April 29, 1895 :

This case depended on questions of fact,—arising out of the testimony,—which were for the exclusive determination of the jury. They were fairly submitted to them with instructions which were fully adequate and at the same time free from substantial error.

The only subject of complaint is the refusal of the learned judge to withdraw the case from the jury by binding instructions to find for the defendant. To have done that would have been manifest error.

Judgment affirmed.